IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ALYCE F. GRIM,
   Plaintiff,

vs.           Case No. 5:08cv145/MCR/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
   Defendant.
_____/

## REPORT AND RECOMMENDATION

   This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

   Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.  PROCEDURAL HISTORY

   On July 12, 2005, Plaintiff filed applications for DIB and SSI, and in each application she alleged disability commencing on April 23, 2000, based on both physical and mental impairments

(*see* Tr. 14, 23).[1]  Plaintiff's applications were denied initially and on reconsideration (Tr. 14).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was held

on October 23, 2007 (Tr. 446–77).  On December 4, 2007, the ALJ rendered a decision in which he

found that Plaintiff was not under a "disability" as defined in the Act (Tr. 14–21).  On April 2, 2008,

the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr.

5–8).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to

review in this court.  Ingram v. Comm'r. of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007);

Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.    FINDINGS OF THE ALJ

On December 4, 2007, the ALJ made several findings relative to the issues raised in this

appeal:

    1)     Plaintiff met the insured status requirements of the Act through March 31, 2002.

    2)     Plaintiff has not engaged in substantial gainful activity ("SGA") since April 23, 2000, the date she alleges she became disabled.

    3)     Plaintiff has the following severe impairments: epilepsy, affective disorder, degenerative disc disease, asthma, history of right arm injury, and history of cocaine abuse.

    4)     Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

    5)     Plaintiff has the residual functional capacity ("RFC") to perform light work, but she cannot climb ropes, ladders, or scaffolds, and she must avoid concentrated exposure to unusual workplace hazards.  Plaintiff has moderate limitations in her capacity to understand, remember, and carry out detailed instructions, and to maintain concentration and attention for extended periods.  Additionally, she is limited to simple, repetitive work.

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on July 22, 2008 (*see* Docs. 10, 11).

6)      Plaintiff is able to perform her past relevant work as a cashier II and as a folder.[2]
(Tr. 14–21).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

---

[2]The ALJ proceeded to the next step "in an abundance of caution" (i.e., in the event Plaintiff's former position as a folder is not considered past relevant work), and made the following pertinent findings:  Plaintiff was born on July 8, 1956, and is considered individual closely approaching advanced age on the alleged disability onset date; she has at least a high school education and is able to communicate in English; transferability of job skills is not an issue because Plaintiff's past relevant work is unskilled; and, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform (*see* Tr. 20–21).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing SGA, she is not disabled.

2.     If the claimant is not performing SGA, her impairments must be severe before she can be found disabled.

3.     If the claimant is not performing SGA and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen,

---

[3]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, hereafter, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY[4]

A.   Personal History

At Plaintiff's hearing before the ALJ she testified that she graduated from high school and was then "employed pretty steadily" for approximately seventeen years (Tr. 449–50).  She quit working due to bipolar disorder ("BPD"), which Plaintiff believes began with the birth of her only child, a son (Tr. 450, 454–55).  Plaintiff stated that her BPD causes "highs and lows," but she has more lows than highs, and she is low about eight months out of the year (Tr. 450, 452–53).  Her highs make her "go, go, go" and no one can stop her, whereas the lows result in no energy, no appetite, loss of interest, and excessive sleeping (Tr. 452–53).  Moreover, when Plaintiff is low she has serious difficulty getting along with other people, and she angers easily (see Tr. 453–54).  Plaintiff explained that she used to go to church and participate in social activities, such as golfing and bowling or going to the park, but she no longer does these things, and her BPD affects her ability to concentrate (Tr. 455–56).  Plaintiff stated that she receives treatment for her BPD from Dr. West, and he prescribes certain medications, including Lithium Carbonate and Tegretol, but Plaintiff testified that the medications are not effective in controlling her condition (Tr. 451–52, 461, 466).  Finally, Plaintiff admitted that she was convicted for writing worthless checks, placed on probation, violated her probation, and was sentenced to prison, but she states she has not "touched any drugs" or "done anything wrong in the last seven years" (i.e., from approximately 2000 to 2007) (Tr. 458).

B.   Relevant Medical History

Although prior to the time frame relevant to this appeal, the file contains records from Frank Froman, a clinical psychologist, who treated Plaintiff in 1992, which was several years after the birth of Plaintiff's son (see Tr. 143).  Potentially relevant to the issues raised in the instant appeal are Plaintiff's report to Dr. Froman in March 1992 that "if she can only get on disability, then her future

---

[4]Unless otherwise noted, the information in this section is derived from the opinion of ALJ.  Moreover, because the issues in this appeal concern Plaintiff's mental impairments, the medical history will not include records relating to Plaintiff's physical impairments.

will be assured," which prompted Dr. Froman to note that Plaintiff "was looking to her epilepsy as a way of getting out of work — indicating that she would be hopeful that this would qualify her" (Tr. 141).  When Dr. Froman advised Plaintiff that epilepsy would qualify her for DIB, but it would also require that she surrender her driver's license, Plaintiff became quite testy and contentious (*id.*). Dr. Froman then noted, in relevant part, that the following observations were clear: 1) Plaintiff "really doesn't want to work"; 2) her seizures are under good control with medication, and her medical doctor feels that she is unlikely to have any more; 3) "There's a tremendous amount of secondary gain for [Plaintiff] to continue having seizures.  She basically doesn't want to work, and is looking for any excuse that she can come up with to vacate work."; and 4) "She's not listening to anybody.  She's very stubborn, has her mind made up.  If I can't tell her that I can help her get disability — something which I absolutely refuse to do, I don't think she has very much interest in continuing our conversations." (*id.*).  On October 22, 1992, Dr. Froman wrote a letter noting that Plaintiff was under "excellent medical control" and seemed "soundly put together psychologically" (Tr. 140).  He further opined that if Plaintiff maintained her medication regimen, she "will not only do very well, but she will not require any further counseling" (*id.*).  Plaintiff returned in December 1992, and Dr. Froman noted at that time that Plaintiff remained "highly interested in looking at the possibility of [] going on disability," but he advised her "flatly in unequivocal terms" that he was "absolutely opposed to it" (Tr. 142).

Plaintiff first saw psychiatrist Ken Gray, M.D., in July 1999, and she reported having been diagnosed with BPD in 1992, but Dr. Gray noted that after a review of her history and "doing the Mental Status Examination" she did not meet any of the criteria for BPD (Tr. 159).  Dr. Gray opined that Plaintiff's reported history sounded more like a dysthymic disorder than BPD (*id.*).  He noted Plaintiff's history of crack cocaine abuse, which reportedly occurred in 1998, and which resulted in Plaintiff's arrest and the removal of her son from her home by a child services agency (Tr. 159, 161).  With regard to her son, Plaintiff advised Dr. Gray that he received a $100,000.00 trust fund from his father when his father was accidently killed, but his father left nothing to Plaintiff because they were divorced at the time of his death (Tr. 159).  Plaintiff admitted that she has "raided" her son's trust fund from "time to time" (*id.*).  Plaintiff also reported to Dr. Gray that her son had been receiving DIB, and she feared going to prison because her son's DIB payments would no longer be

coming to her, because her son would no longer be in her "custody" (*id.*).   Among other observations, Dr. Gray specifically noted that Plaintiff had "no evidence of mania in her past history" and that she was a vague or inconsistent historian with regard to the number of times she had been incarcerated (Tr. 162).   Plaintiff was diagnosed with cocaine abuse by history, postpartum depression by history, dysthymic disorder, and antisocial personality disorder, and she was assessed with a Global Assessment of Functioning of 52,[5] "today" (i.e., on July 20, 1999) (*id.*).   Plaintiff was advised to begin taking Prozac, participate in parenting classes and "Depression Group," continue with a drug treatment program, and return in two weeks (Tr. 163).   Plaintiff returned in August 1999, at which time she reported that the Prozac "has really helped" (Tr. 158).   She was feeling better, her affect was brighter, her mood appeared stable, and her only problem was an upcoming court date at which time she feared she would go to jail (*id.*).   In September 1999, Plaintiff reported "doing well with no problems," and she specifically noted that the Prozac was working very well with no side effects, and she was no longer depressed (Tr. 156).   Plaintiff returned in December 1999 and saw a nurse (Tr. 155).   She reported doing "very well" on the Prozac, but Plaintiff noted that it was expensive and she was applying for the "Indigent Program" to cover the costs (Tr. 155; *see also* Tr. 156 (Dr. Gray recommending the "Prozac Indigent Program")).   Plaintiff saw the same nurse in early March 2000, at which time Plaintiff stated that "her depression has improved greatly on the Prozac" (Tr. 153).   The nurse noted that Plaintiff's diagnosis of BPD was apparently a "mis-diagnosis to begin with" (*id.*).   Plaintiff's diagnoses generally remained the same throughout her treatment, but she was additionally diagnosed with generalized anxiety disorder (*id.*).   Plaintiff returned in late March 2000 with a bright affect and increased energy; she was then working as a waitress and her only reported problem was difficulty sleeping (Tr. 152).

Plaintiff's file contains approximately 100 pages of records from the Florida Department of Corrections ("DOC"), which the ALJ summarized as follows:   "Records from the [DOC] covering 2002 through 2004 were thoroughly reviewed.   [Plaintiff] was consistently diagnosed with a bipolar

---

[5]GAF is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.   American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).   It may be expressed as a numerical score. *Id.* at 32.   A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning  (e.g., few friends, conflicts with peers or co-workers). *Id.*

disorder but responded well to medication.  She was noted to have adjusted to incarceration and even participated on work release." (Tr. 17, 164–264).  While all of the DOC records are not fully legible, they appear to generally corroborate the summary provided by the ALJ.  For example, the DOC records reflect that in January 2002, Plaintiff's adjustment to prison was noted to be "fair to good" (Tr. 235).  In November 2002, Plaintiff was diagnosed with BPD, and in December 2002, Plaintiff was noted to be "doing fairly well on [her] current regimen" (Tr. 199).  On May 9, 2003, Plaintiff was again diagnosed with BPD, and on August 15, 2003, Plaintiff "reported doing well on Prozac," and it was noted that she was "working on work release" (Tr. 171, 181).

On August 29, 2005, following Plaintiff's release from the DOC, she reported to the Life Management Center ("LMC"), where she had received counseling prior to her incarceration, for a psychosocial assessment and to resume services (Tr. 266).  Plaintiff stated that she was applying for disability and reported being manic, but staff noted that she "appeared calm" and that she was presently taking no medications (Tr. 270–71).  Plaintiff was diagnosed with BPD, prior history of cocaine abuse, and prior history of antisocial personality disorder, and she was assessed with a GAF of 60 and advised to follow up with the Washington County Health Department (Tr. 272).

Plaintiff sought mental health treatment with Samuel West, Jr., M.D., Ph.D., beginning on September 5, 2005, at which time Plaintiff reported that her "chief complaint" was her diagnosis of BPD, and she reported symptoms consistent with a BPD (*see* Tr. 400).  Dr. West noted that Plaintiff was cooperative, she "answered questions with goal directed answers without loose associations or tangentiality," her mood was somewhat euphoric, her immediate recall and recent and remote memory were normal, her speech and language were normal, her fund of knowledge was normal, her insight and judgment appeared intact, and she was fully oriented to person, place, time and situation (*id.*).  Dr. West diagnosed Plaintiff with BPD and noted that Plaintiff appeared to have experienced the onset of BPD after the birth of her son (Tr. 401).  Plaintiff was prescribed Depakote and Lithium Carbonate and advised to return in three weeks (*id.*).  Plaintiff returned in late September 2005 and reported that she was doing better, her mood had been "more level," she was free of any suicidal ideation, and her only real complaint concerned difficulty sleeping (Tr. 398).  Plaintiff advised Dr. West that she had applied for DIB, and he advised her that he thought "it was very possible she would be able to work in the future if [her] medication worked well" (*id.*).

Plaintiff returned a month later and denied having any further problems with depression, her mood continued to be more level, and she no longer had trouble sleeping, but her head "felt funny," and Plaintiff stated that she would not be able to work because of this (Tr. 397).  Dr. West again advised Plaintiff that her condition was treatable, and he encouraged Plaintiff to consider returning to work rather than pursuing DIB (*id.*).  In January 2006, Plaintiff saw Dr. West and reported feeling worse, such as feeling more depressed with less energy and motivation (Tr. 396).  The same conversation ensued regarding Plaintiff's belief that she could not work and Dr. West's belief that her condition was treatable (*id.*).  Dr. West also "emphasized that her mood would be better if she were working and that this was a reasonable goal to work towards" (*id.*).  Plaintiff returned approximately once a month through June 2006, during which she reported that her medications were not working (*see* Tr. 393–95).

On July 5, 2006, Dr. West completed a form that required him to estimate the degree of Plaintiff's impairment, in eighteen areas of mental functioning, as "mild" (does not affect ability to function), "moderate" (affects but does not preclude ability to function), "marked" (seriously affects ability to function), or "extreme" (extremely impairs ability to function) (Tr. 390–91).  Dr. West found four areas of functioning to be "markedly" impaired, ten areas to be "moderately" impaired, and four areas to be only "mildly" impaired; he found no "extreme" functional limitations (*id.*).  Pertinent to the issues raised in this appeal, the areas of "marked" limitations noted by Dr. West concern:  1) Plaintiff's ability to interact appropriately with the general public; 2) restriction of Plaintiff's daily activities, such as church, school, or socialization; 3) Plaintiff's ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; and 4) Plaintiff's ability to respond to customary work pressures (*id.*).  On another form completed in July 2006, Dr. West (or his nurse) opined that Plaintiff's prognosis was "good" unless Plaintiff was noncompliant with her medications or the medications failed to work (Tr. 403).

Plaintiff returned to Dr. West on August 23, 2006, and saw him approximately every other month through June 2007 (*see* Tr. 406, 408–09, 411–13).  Plaintiff continued to report problems with her medications, and adjustments were made to her medication regimen (*see, e.g.*, Tr. 413).  Following a switch from Depakote to Tegretol, Plaintiff reported doing better, but she continued to

complain of depression, noting that she was more often low than high (Tr. 411).  As late as June 2007, and despite adjustments to Plaintiff's medications, she continued to complain of depression and reported only minimal benefit from her medications (Tr. 406).  The final record in the file from Dr. West is dated September 24, 2007 (Tr. 422).  Plaintiff again complained of the ineffectiveness of her medications, and she reported feeling stressed and irritable, although Dr. West noted that there had been no change in Plaintiff's medical status (*id.*).

On May 7 and November 13, 2007, Dr. West wrote letters on Plaintiff's behalf in connection with her application(s) for food stamps (Tr. 407, 410).  In each letter Dr. West noted that he was continuing to adjust Plaintiff's medications in an effort to better control her BPD, but that Plaintiff continues "to display a significant level of impairment that probably precludes her from being able to engage in any type of employment" (*id.*).

C.        Opinions from Consultative Examiners and Non-Examining Physicians

On October 4, 2005, Plaintiff was evaluated by Sam Banner, M.D., at the request of the Disability Determination Service ("DDS").  Plaintiff indicated that she last worked in June 2005 "in cleaning," and she explained that she felt that she could not maintain employment due to mental illness (Tr. 290).  Plaintiff's physical examination was essentially normal, and she was assessed with mental illness by history, depression by history, chronic low back pain by history, and bilateral wrist pain by history (Tr. 290–93).

On October 13, 2005, psychologist Robert F. Schilling, Ph.D., completed a Psychiatric Review Technique form ("PRTF") for the period covering April 23, 2000 through October 13, 2005 (Tr. 295–308).  He evaluated Plaintiff's psychiatric condition under Sections (or "Listings") 12.04 and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Affective Disorders* and *Substance Addiction Disorders*) and found that Plaintiff suffered from a medically determinable impairment; namely, bipolar syndrome (Tr. 295, 298).  He further opined that Plaintiff's BPD resulted in "marked" difficulties in maintaining social functioning, "moderate" restriction of activities of daily living and in Plaintiff's ability to maintain concentration, persistence or pace, and "no" repeated episodes of decompensation (Tr. 305, 307).  Thus, Dr. Schilling opined that Plaintiff's BPD did not meet or equal an impairment listed in Section 12.04 (*see* Tr. 305–06).  Next, Dr. Schilling completed a PRTF for the period covering April 23, 2000 through March 31, 2002 (the time frame relevant to

Plaintiff's claim for DIB) (Tr. 309–22).  Dr. Schilling again evaluated Plaintiff's impairments under Sections 12.04 and 12.09, but on this PRTF he also evaluated Plaintiff's condition under Sections 12.06 and 12.08 (*Anxiety Related Disorders* and *Personality Disorders*) (*see* Tr. 309).  He opined that Plaintiff suffered from medically determinable impairments; namely, dysthymic disorder in remission, post partum depression by history, generalized anxiety disorder, and antisocial personality disorder (Tr. 312, 314, 316).  However, none of these impairments satisfied the diagnostic criteria of the Listings and resulted in only mild functional limitations (*see* Tr. 318, 320–21).  Lastly, Dr. Schilling completed a Mental RFC Assessment on October 13, 2005, which reflected Plaintiff's abilities as of that date (*see* Tr. 323).  He found that Plaintiff had no "marked" limitations in any of the twenty areas of functioning he was asked to assess, and he opined that Plaintiff was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from any [psychological] impairment" (*see* Tr. 323–25).

Psychologist Suzanne K. Zoss, Ph.D., completed two PRTFs on February 2, 2006, for the same time periods as those completed by Dr. Schilling (Tr. 353–66, 367–80).  Although Dr. Zoss noted that Plaintiff suffered from certain medically determinable impairments during the wider time frame, she opined that none of those impairments met or equaled a listed impairment and that Plaintiff had no "marked" functional limitations (*see* Tr. 356, 363–64).  Specifically, Dr. Zoss opined that Plaintiff had "mild" restriction of activities of daily living, "moderate" difficulties in maintaining social functioning, and "mild" difficulties in maintaining concentration, persistence or pace, and "no" repeated episodes of decompensation (Tr. 363).  During the narrower time frame (i.e., the time frame relevant to Plaintiff's claim for DIB), Dr. Zoss opined that there was insufficient evidence to establish the presence of any mental impairment, and she noted that Plaintiff appeared to have been "functioning adequately and was not limited" (*see* Tr. 367, 370, 378–79).

V.      DISCUSSION

Plaintiff raises three issues in the instant appeal.  Plaintiff contends that the ALJ erred in his consideration of the opinions of Dr. West, a treating physician, and in his consideration of an opinion of Dr. Schilling, a non-examining DDS physician, that Plaintiff has "marked" difficulties in maintaining social functioning (Doc. 13 at 14–20).  Plaintiff additionally contends that the ALJ erred in finding that she was less than fully credible (*id.* at 14, 21–23).

A.     ALJ's Consideration of the Opinions of Dr. West and Dr. Schilling

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d at 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of

vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e).  The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims.  The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.  For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.  SSR 96-5p.  In Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997), the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled.  To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters. Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters.  These things are not properly considered by the Commissioner in determining disability.  20 C.F.R. § 404.1566. For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not

a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

Finally, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

### i.    Dr. West — A Treating Physician

As noted *supra*, Dr. West opined in July 2006, that Plaintiff was "markedly" limited in certain areas of functioning, such as completing a normal workday and responding to work pressures, and he opined in May 2007 that Plaintiff was "probably" precluded from work (*see* Tr. 390–91, 407). The ALJ acknowledged these opinions, but rejected them, noting that they are inconsistent with Dr. West's treatment notes, which contain his repeated suggestions that Plaintiff return to work rather than pursue disability (Tr. 17, 396–97). Indeed, on three occasions Dr. West recommended to Plaintiff that she return to work rather than pursue DIB (*see* Tr. 398 (September 26, 2005), Tr. 397 (October 26, 2005), Tr. 396 (January 25, 2006)). Moreover, Dr. West's recommendations regarding Plaintiff's return to work are consistent with his treatment records. For example, on September 5, 2005, Dr. West conducted a thorough mental status examination and psychiatric evaluation of Plaintiff, the results of which were essentially normal (*see* Tr. 400–01). Although Plaintiff was diagnosed with BPD after the examination, the diagnosis is no different from that contained in the DOC records, which reflect that Plaintiff was able to participate in a work release program despite the BPD diagnosis. Perhaps more important, on September 5, 2005, Dr. West prescribed certain medications to Plaintiff, and when she returned to Dr. West on September 26, 2005, Plaintiff reported that she was doing better, her medications appeared to be effective, and she had no real complaints other than difficulty sleeping (*see* Tr. 398). It was at this time that Dr. West first suggested to Plaintiff that she pursue work instead of DIB, advising Plaintiff that she would be able to work if her medications continued to work well (*id.*). Similarly, the second time Dr. West suggested to Plaintiff that she work instead of pursue DIB, he advised Plaintiff that her

condition was treatable (Tr. 397).  Plaintiff again expressed her desire to obtain DIB, however, and noted that she was having financial problems (*see id.*).  But, during the same visit Plaintiff reported having no further problems with depression, she stated that her mood had been more level, and Dr. West observed that her affect was brighter (*id.*).  The third time Plaintiff brought up the subject of DIB, on January 25, 2006, Dr. West again advised Plaintiff that her condition was treatable (Tr. 396).  Notwithstanding, Dr. West apparently agreed to fill out DIB forms on Plaintiff's behalf at that time (*see id.*).[6]

Thus, the ALJ did not err in finding that Dr. West's treatment notes are inconsistent with an opinion that Plaintiff is "markedly" limited in her ability to work or an opinion that Plaintiff is "probably" precluded from work.  Although Plaintiff is correct in noting that Dr. West's recommendations (i.e., that Plaintiff return to work) were made relatively early in their treating relationship, the opinions were offered during a time frame relevant to this appeal.  They were also made long after April 23, 2000, Plaintiff's alleged onset of disability, and long after March 31, 2002, Plaintiff's date last insured for DIB purposes.  Moreover, the records that immediately precede Dr. West's treatment records and recommendations are the DOC records from 2002 through 2004, which reflect that Plaintiff was able to work in a work release program and that she responded well to medication.  "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."  Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (citation omitted).  Similarly, Dr. West's records reflect a positive response to the medications he prescribed, at least initially (i.e., before Dr. West advised Plaintiff that her condition was treatable and she would be capable of work if her medications worked).[7]  While Plaintiff subsequently reported to Dr. West that her medications were ineffective, Dr. West's more recent records reflect no significant changes in Plaintiff's health or status, as ALJ noted (Tr. 17, 393–95).  Thus, the ALJ properly

---

[6]As discussed *supra*, the Commissioner "will not give any special significance to the source of an opinion on issues reserved for the Commissioner," such as an opinion that a claimant is disabled. 20 C.F.R. § 404.1527(e)(3).

[7]In addition to Dr. West's initial records and the DOC records, other medical records consistently reflect reports by Plaintiff that her medications were effective (*see, e.g.*, Tr. 152, 153, 155, 156, 158 (reports by Plaintiff in 1999 and 2000)).  It was after Plaintiff was advised by Dr. West that her condition was treatable if her medications were effective that Plaintiff began to report that her medications were ineffective.  And, as discussed *infra*, the ALJ found that Plaintiff's subjective complaints were not fully credible.

rejected Dr. West's opinions that Plaintiff has "marked" work-related mental limitations, and he properly relied on other opinions in the record in determining that Plaintiff has, at most, only "moderate" functional limitations and is capable of engaging in work.

ii.    Dr. Schilling — a Non-Examining DDS Physician

With regard to Dr. Schilling, Plaintiff contends that the ALJ erred in failing to provide adequate reasons for rejecting his opinion that Plaintiff has "marked" limitations in maintaining social functioning (Doc. 13 at 20).  The ALJ acknowledged this opinion by referencing Exhibit 8F, which is the PRTF completed by Dr. Schilling on October 13, 2005, and which covers the time period from April 23, 2000 through October 13, 2005 (see Tr. 17, 295–308).[8]  But, the ALJ did not adopt this opinion of Dr. Schilling because he found "the cumulative evidence to outweigh said opinion" (Tr. 17).

Before addressing Plaintiff's argument, it is helpful to consider the ALJ's statement in the context it was made.  The ALJ was discussing whether Plaintiff's mental impairment met or equaled a listed impairment (the ALJ's "Step Three" determination) (see id.).  In finding that it did not, the ALJ concluded that Plaintiff's mental limitations result in "mild restriction of activities of daily living, <u>moderate</u> difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace" (id.) (emphasis added).[9]  And, in making these findings, the ALJ considered the opinions of Dr. Schilling and Dr. Zoss, but he accorded more weight to the opinions of Dr. Zoss because her opinions were more consistent with the "cumulative evidence" in the record.

The "cumulative evidence" to which the ALJ referred includes the medical evidence summarized by the ALJ in the same discussion at Step Three (see Tr. 16–18).  Specifically, the ALJ discussed Dr. Gray's examination, including Plaintiff's report to Dr. Gray that her only problem was

_____

[8]On the other PRTF, which relates to Plaintiff's claim for DIB (i.e., the time period from April 23, 2000 through March 31, 2002), Dr. Schilling found only "mild" difficulties in maintaining social functioning (Tr. 319).  Thus, if Plaintiff were to prevail on this ground for relief, it would be relevant only to her claim for SSI.

[9]Plaintiff does not dispute the ALJ's finding that her mental impairment did not meet or equal a listed impairment.  Thus, Plaintiff's ground for reversal appears to actually concern the ALJ's RFC finding, which includes at most "moderate" mental limitations, and which is therefore inconsistent with Dr. Schilling's opinion that Plaintiff is "markedly" limited in her ability to maintain social functioning (Tr. 18).

difficulty sleeping (*see* Tr. 16 (referencing Exhibit 4F, Dr. Gray's records)); the DOC records (*see* Tr. 17); Dr. West's records, including Plaintiff's report to Dr. West that she was "doing better," an observation by Dr. West in October 2005 that Plaintiff's condition was well controlled when she was compliant with medication, and Dr. West's recommendations that Plaintiff work rather than pursue DIB; as well as an opinion in the record that Plaintiff's prognosis was good (*see* Tr. 17).  This evidence, like the evidence provided by Dr. Zoss, is inconsistent with an opinion that Plaintiff is "markedly" limited in maintaining social functioning.  While Dr. Zoss's PRTF opinions are less restrictive than those of Dr. Schilling, it is an ALJ's task to examine the evidence and resolve conflicting reports, *see* Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996); Powers v. Heckler, 738 F.2d 1151, 1152 (11th Cir. 1984) (per curiam), and in doing so here the ALJ found that the cumulative effect of the evidence of record was more consistent with the opinions of Dr Zoss than Dr. Schilling — a finding that has substantial support in the record.

Moreover, although Dr. Schilling opined on the October 13, 2005 PRTF (which covers the time period from April 23, 2000 through October 13, 2005) that Plaintiff had marked difficulties in maintaining social functioning (Tr. 305), he opined on the October 13, 2005 Mental RFC Assessment (which reflects Plaintiff's abilities on October 13, 2005), that Plaintiff had no marked social functional limitations (Tr. 324).  Thus, Dr. Schilling's opinions appear to be inconsistent, or alternatively, reflect an improvement in Plaintiff's ability to function socially.  Moreover, Dr. Schilling's opinions on the Mental RFC Assessment are consistent with the RFC determined by the ALJ (*compare* Tr. 18 (RFC determined by the ALJ, which includes moderate limitations in Plaintiff's ability to understand, remember, and carry out detailed instructions and maintain concentration and attention for extended periods) *with* Tr. 323–25 (Dr. Schilling's Mental RFC Assessment, with the same limitations).  Furthermore, the ALJ's ultimate finding that Plaintiff was capable of performing simple repetitive work in unskilled positions is consistent with Dr. Schilling's narrative opinions on the Mental RFC Assessment.  In relevant part, Dr. Schilling specifically opined that despite Plaintiff's psychological impairments she would be expected to understand, remember and carry out simple one and two-step instructions, perform work in a stable environment, maintain regular and punctual work attendance, and "meet the basic mental demands of competitive work on a sustained basis" (*see* Tr. 18, 20–21, 325).  For all of these reasons, the ALJ did not err in

his consideration of the opinions of Dr. Schilling and did not err in finding that Plaintiff has, at most, "moderate" mental functional limitations that would not preclude her from performing work.

B.      ALJ's Credibility Findings

Plaintiff alleges that the ALJ failed to comply with the law of the Eleventh Circuit in evaluating her credibility, and therefore, the Commissioner's decision should be reversed (Doc. 13 at 21–23).

The Eleventh Circuit has established a three-part "pain standard" which applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms.  This standard requires:  (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  *See* Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986); *see also* Foote, 67 F.3d at1560 (11th Cir. 1995); Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Mason v. Bowen, 791 F.2d 1460, 1462 (11th Cir. 1986)).[10]

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002).  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)).

---

[10]The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  *Id.*; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." MacGregor, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  Jones v. Dep't of Health and Human Serv's, 941 F.2d 1529, 1532 (11th Cir. 1991).

Here, in considering Plaintiff's credibility, the ALJ first made reference to 20 C.F.R. § 404.1529, which contains the same language interpreted by the Eleventh Circuit in establishing the three-part pain standard (Tr. 18).  Thus, the ALJ clearly recognized the appropriate standard and did not err in failing to specifically cite the Eleventh Circuit standard.  Wilson, 284 F.3d at 1226.  The ALJ then acknowledged the existence of an underlying mental impairment; indeed, he found Plaintiff's affective disorder to be a severe impairment (Tr. 16, 18).  The ALJ also found that while Plaintiff's medically determinable impairments could reasonably be expected to produce Plaintiff's alleged symptoms, her statements concerning the intensity, persistence and limiting effects were not entirely credible (Tr. 20).

In finding Plaintiff not fully credible, however, the ALJ provided only one specific reason: "Dr. West noted in several treatment records that [Plaintiff] would benefit from employment." (*id.*).  As noted *supra*, this reason is supported by the record, but whether it provides a sufficient basis for upholding the ALJ's ultimate credibility findings is another question.  Under the facts of this case, however, the undersigned concludes that the ALJ's credibility findings should be upheld.

First, the one specific reason stated by the ALJ is an extraordinarily persuasive reason for discounting Plaintiff's complaints.  The conversations between Dr. West and Plaintiff identified by

the ALJ are not unlike the conversations between Dr. Froman and Plaintiff, and again, demonstrate a strong element of secondary gain by Plaintiff.  Moreover, the record demonstrates Plaintiff's determination to obtain assistance from any source other than employment, as evidenced by Dr. Froman's records, Plaintiff's reports to Dr. Gray of "raiding" her son's trust account and fearing going to prison because she would lose his DIB income, and her repeated suggestions to Dr. West that she preferred pursuing DIB over working, despite Dr. West's recommendations to the contrary. An ALJ may discount a claimant's subjective complaints for, among other reasons, that she appeared to be motivated to qualify for disability benefits.  *See* Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004); Frey v. Bowen, 816 F.2d 508, 516 (10th Cir. 1987) (citing Byron v. Heckler, 742 F.2d 1232, 1235 (10th Cir. 1984) (subjective complaints must be evaluated with due consideration for credibility, motivation, and medical evidence); Gaddis v. Chater, 76 F.3d 893, 895–96 (8th Cir. 1996) (strong element of secondary gain in plaintiff's conduct belies his sincere belief that he is truly disabled and unable to perform any substantial gainful activity).

Moreover, in addition to specifically identifying one reason for discounting Plaintiff's complaints, the ALJ more generally stated that he had "consider[ed] the evidence of record" in determining Plaintiff's credibility, and after considering the evidence of record, he found Plaintiff's symptoms not entirely credible (Tr. 20).  While it would have been better for the ALJ to specifically identify the evidence he considered, the undersigned concludes that the ALJ's decision should nevertheless be upheld because the ALJ's general reference to the full record and his corresponding summary of the record supports his ultimate credibility determination (especially when considered together with the one specific reason he cited for rejecting Plaintiff's complaints, as discussed *supra*).

For example, as previously noted, the ALJ's summary of the record includes a summary of the records of Dr. Gray, the DOC, Dr. West, and Dr. Zoss, which are in large part inconsistent with Plaintiff's complaints (Tr. 16–18).  The ALJ also specifically referenced records from September 2007 reflecting that Plaintiff was the primary caretaker of her elderly mother (Tr. 18, 422).  While caring for her mother created some stress for Plaintiff, the ALJ's point was that Plaintiff was mentally capable of the demands of being a caretaker, which is inconsistent with her complaints (*see* Tr. 18).  Additionally, at least through late October 2005, Plaintiff reported that her medications

effectively controlled her condition.  Although Plaintiff more recently complained to Dr. West that her medications were often ineffective, the ALJ noted that Dr. West reported no significant change in Plaintiff's condition (Tr. 17), and the record reflects that Dr. West consistently worked with Plaintiff in adjusting her medications when she complained that they were ineffective.  Thus, the ALJ's credibility discussion, while not the model of perfection, leads the undersigned to conclude that he considered Plaintiff's condition as a whole, and he did not "broadly reject" Plaintiff's subjective complaints.  Dyer, 395 F.3d at1210.  Rather, the ALJ cited the appropriate Regulation, articulated the applicable standard, provided a specific reason for finding Plaintiff less than fully credible, and more generally discounted Plaintiff's complaints based on the overall evidence of record.

Although evidence in the record arguably exists to support a decision contrary to that reached by the ALJ, the court is limited in its inquiry and is not empowered to reweigh the evidence.  *See generally* Martin, 894 F.2d at 1529 (the reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner); Sewell, 792 F.2d at 1067 (even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence).

Thus, for the foregoing reasons, the undersigned concludes that the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 8th day of May 2009.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; **United States v. Roberts**, 858 F.2d 698, 701 (11th Cir. 1988).